COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-113-CR

 

 

CYNTHIA SUE HARDEE                                                        APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 371ST
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  Introduction

In seven issues, Appellant Cynthia Sue Hardee
appeals her convictions for theft of property and misapplication of fiduciary
property.  We affirm.








                              II.  Factual and Procedural History

The friends and family of the complainant, Johnny
Bryant, describe him as Aslow@ and Atrusting.@  According to the State=s
expert, forensic clinical psychologist Jack Price, Johnny=s full
scale IQ is 76, leading Price to classify Johnny as Aborderline
intellectual functioning or borderline . . . mentally retarded.@

Johnny withdrew all of the money he had
accumulated over thirty years as a grocery store stocker from the store=s
profit-sharing planC$111,275.23 after taxes and the
early withdrawal penalty.[2]  He contributed this money to finance a
business with Hardee.

Hardee used $100,000 of the funds to purchase a
certificate of deposit, used the certificate of deposit to take out a $100,000
loan, and placed the proceeds of the $100,000 loan into a joint checking
account under her name and Johnny=s, which
she opened with $10,000 from the $111,275.23.[3]








Johnny wrote no checks, but Hardee did.  As recounted at trial, among other things,
Hardee used the funds in the checking account to pay bills for herself and her
friends; to pay for vision check-ups and new glasses; to treat her daughter and
niece and Johnny=s daughter to Build-A-Bear
parties; to rent furniture and a big-screen television for her home; to have
her hair styled and her dog groomed; to buy Christmas decorations for herself
and her friends; to buy musical instruments for her family and friends; to send
money to her brother=s prison account; and to tithe a
large amount to her church.[4]  A partial list of some of Hardee=s
expenditures (less benefits received by Johnny), according to the State=s
forensic accountant=s testimony and exhibits at
trial, is as follows:

$                                                                                                                                                                  
Vehicles & Trailers:                      $26,822.94 

 

$                                                                                                                                                                  
Alpha Excavating:                        $15,206.00

 

$                                                                                                                                                                  
Crossroads Baptist Church:           $11,627.40 

 

$                                                                                                                                                                  
Wal-Mart:                                     $2,391.22

 

$                                                                                                                                                                  
The Music Center                   $1,855.52

 

$                                                                                                                                                                  
ABC Distributors:                   $1,344.15

 

$                                                                                                                                                                  
Doctor Visits:                                $1,087.59

 

$                                                                                                                                                                  
Brookshire=s:                                   $994.35

 

$                                                                                                                                                                  
Credit Card Payment:                        $700.00

 

$                                                                                                                                                                  
Lifeway Christian Store:                    $699.12








$                  
Christie Wethington (scrapbooking):   
$414.05

 

$                                                                                                                                                                  
Build-A-Bear                                    $313.41

 

$                                                                                                                                                                  
Hair Cut:                                         $45.00

 

$                                                                                                                                                                  
Hollywood Hounds:                           $35.64 

 

$                                                                                                                                                                  
Blockbuster:                                     $30.03

 

$                                                                                                                                                                  
Country Candles & Fans:                    $29.73

 

$                                                                                                                                                                  
Azle Jr. High (Hardee=s daughter):        $20.00

 

$                                                                                                                                                                  
American Craft Mall:                          $14.33

 








Johnny and Hardee never started a business.  Within three months, the funds were gone,[5]
and Johnny appeared on his sister=s
doorstep with two garbage bags containing his possessions, homeless.  The State charged Hardee with theft of
property valued at $20,000 or more but less than $100,000, and with
misapplication of fiduciary property valued at $20,000 or more but less than $100,000.[6]  A jury found Hardee guilty on both counts and
assessed punishment at five years=
confinement on each count (to run concurrently) and a $10,000 fine on each
count.  This appeal followed. 

                              III.  Legal and Factual Sufficiency

In her first two issues, Hardee complains that
the evidence is legally and factually insufficient to support her
convictions.  Although Hardee purports to
challenge her conviction for misapplication of fiduciary property based on the
legal and factual sufficiency of the evidence on the intent element of that
crime, see Tex. Penal Code Ann. ' 32.45(b),
she has failed to adequately brief this portion of her first two points.[7]  Therefore, we overrule this portion of her
first two points.

A.  Standards of Review








In reviewing the legal sufficiency of the
evidence to support a conviction, we view all of the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  The trier of fact is the sole judge of the
weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2008).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v.
State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert. denied, 129
S. Ct. 1037 (2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson v. State, 23 S.W.3d 1, 12
(Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).  Unless the record clearly
reveals that a different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, unless we conclude that it is necessary
to correct manifest injustice, we must give due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Id. at 9.  Our deference in this regard safeguards the
defendant=s right to a trial by jury.  Lancon, 253 S.W.3d at 704.  B. 
Effective Consent

Theft occurs when a person  Aunlawfully
appropriates property with intent to deprive the owner of [the] property,@ without
the owner=s effective consent.  Tex. Penal Code Ann. '
31.03(a), (b)(1).  Consent is not
effective if it is given Aby a person who by reason of . .
. mental disease or defect . . . is known by the actor to be unable to make
reasonable property dispositions.@  Id. ' 31.01(3)(C).








Hardee argues that the evidence is not sufficient
to show that Johnny lacked the ability to give valid consent and to show that
she was aware of his inability, if any, to give valid consent.[8]

Hardee first directs us to Johnny=s sister=s
testimony for the proposition that it appeared that Johnny consented to every
withdrawal, and she claims that, in the record, the State Aacknowledges
that [Hardee] obtained consent from [Johnny] for all transactions.@  Johnny=s sister
testified as follows with regard to a conversation she had with Hardee, with
Johnny present, when she learned about the expenditures:

Q.  And when you were asked about expenditures
and stuff, when [Hardee] would tell you what they were on and such, Johnny was
agreeing for the most part, wasn=t he?

 

A.  It might appear that way.

 

Q.  Well, he did, didn=t he?

 

A.  It might appear that way, that he was
agreeing.

 

Q.  When she said that Johnny wanted this done,
Johnny was saying, AYeah, I remember that,@ things of that nature;
is that correct?








A.  He made all kinds of comments.

 

Q.  He made what?

 

A.  All kinds of comments.

 

Q.  Well, he never said, A[Hardee] took this money
from me,@ did he?

 

A.  On that particular day?

 

Q.  On that tape.[9]  Anytime during that meeting.

 

A.  No.

 








But Johnny=s sister also testified that
Johnny went through first grade twice, had been a special education student,
and could not read or do math problems, and that it had taken their mother four
years to teach Johnny to drive, even when using the same route every day, which
could have reasonably allowed the jury to conclude that any consent Johnny gave
was ineffective.  And the other portion
of the record Hardee cites to support her proposition that the State
acknowledged that Hardee had consent from Johnny does not do so; instead, it
only establishes the following:  that
Johnny finished high school with a A[s]pecial
education diploma@; that when his sister asked him
about his plans for businesses, Ahe just
said that it was all being taken care of@ and
that she did not know about any specific businesses before the checks came to
light; and that Johnny had been married twice, had three children from those
two marriages, and was able to support them.[10]








Hardee acknowledges that the State presented a
number of witnesses who testified that Johnny was Aslow,@ but she
contends that the witnesses she presented who had dealings with Johnny Anever
noticed any obvious mental problems,@
supporting her contention that the evidence is insufficient to prove her
awareness of his condition.[11]  Hardee refers to the testimony of John
Webster, the music minister of Crossroads Baptist Church, who testified that
Johnny did not seem any different to him from anyone else.[12]  But Webster also testified that he did not
think Johnny ever joined the church, although he Adid
attend there for a while.@[13]  And he testified that when Johnny asked him
to attend a seminar on how to become a millionaire because Johnny did not want
to go to it alone, he told Johnny that he was not interested.

Hardee also refers to the testimony of Ann
Jensen, a Rent-A-Center employee with a history of renting to Johnny.  Jensen testified that she never had any
concerns about renting property to Johnny and that nothing ever happened to
make her think Johnny was incompetent. 
She acknowledged that if she had thought he was incompetent, she could
not have rented anything to him.  She
stated that she had no reason to believe that he could not read the rental
contract, but she also stated that out of all of her customers, Amaybe
two percent@ read the contract and that she
did not think Johnny read it A[u]nless
he took his copy and read it.@








Hardee also refers to the State=s expert
witness=s
diagnosis of Johnny as suffering Afrom a
mild defect@ to support her effective
consent argument.  But the State=s expert
witness testified that Johnny had a Amoderate
defect in intelligence,@ not a Amild@ defect,
and he testified that based on his evaluation of Johnny, he concluded that
Johnny Ais
defective or intellectually and academically impaired,@ and
that Abased on
[his] testing and observations of [Johnny], . . . he is not able to manage his
own financial affairs.@ 
He added that Johnny is easily exploited by others Adue to
his intellectual defects,@ that Johnny is dependent on
others and Aneeds and wants and seeks out
assurance and guidance from others, and he can be quite easily taken advantage
of.@

Hardee contends that the State=s
evidence does not support an inference that Johnny suffers from a defect that
leaves him incapable of making a reasonable disposition of his property, Amuch
less that [she] was fully aware of such a defect.@  And she challenges the credibility of several
of the State=s witnesses: Sean Trotter, who
received some of Johnny=s money; Sam Gilley, who
volunteered with Johnny for the Texas Girls Choir;[14]
and Carol Crumbaker, an officer manager at the Brookshire=s where
Johnny works.[15]








However, it is the jury=s duty
to evaluate the credibility and demeanor of witnesses and to determine the
weight and credibility of the evidence, not ours.  See Johnson, 23 S.W.3d at 8B9.  And after reviewing the record, we conclude
that even without the testimony of these witnesses, there was ample evidence
upon which the jury could have concluded that Johnny had a mental defect that
would prevent him from being able to make reasonable property dispositions and
that, beyond a reasonable doubt, Hardee was aware of it.  See Tex. Penal Code Ann. ' 31.01(3)(C).

First, in addition to the State=s expert
witness=s
testimony about Johnny=s intellectual capacity and the
testimony of Johnny=s sister, the jury also heard
Nell Dahl, one of Johnny=s childhood friends, testify
that she has known Johnny for fifty years, that he has been mentally challenged
for as long as she has known him, that he was Aspecial@ and
different mentally (Aback then, we said mentally
retarded@), that
he did not read or write, and that it was obvious that he was mentally
challenged.








Then, Alvie Lee Meredith, Johnny=s
co-worker and roommate, also testified that Johnny was Amentally
challenged,@ that he was a Avery
trusting@ person,
and that he would be easily taken advantage of. 
He stated, AJohnny is the type person, you
rob him blind, he=ll help you do it.@  Meredith also testified that while he was
Johnny=s
roommate, Hardee gave them a 32-inch television when she replaced it with the
big screen television that elsewhere the record reveals she rented from
Rent-A-Center and for which she made at least one payment using Johnny=s
funds.  He testified that he, Hardee, and
Johnny went to a furniture store and purchased a bed set for Meredith using
Johnny=s funds,
that it was Hardee=s idea more than Johnny=s to do
so, and that Hardee got the new mattress out of the set and Meredith received
her used one.

Additionally, William Sharp, another of Johnny=s
childhood friends, testified that Ayou
wouldn=t have
to be around@ Johnny for long to realize he
was slow.  He further testified that it
would be easy to pick up on Johnny=s
slowness Apretty quick@ because
of Ahis
actions, the way he carried his self [sic], his speech.@  He also testified that he did not think, as
to numerical issues and financial transactions, that Johnny would be able to
distinguish between a hundred dollars and a thousand dollars, but that Johnny
could do tasks involving repetition. 
Jack Allen, a former volunteer fireman, testified that A[t]here=s no
question@ that
Johnny was mentally challenged because he was slow in thinking and reacting to
situations.  He stated, AYou
could talk to him for just a few minutes, and you realized that he wasn=t as
quick witted as what we=d call normal people.@








Finally, Hardee=s own
testimony provided the jury the opportunity to judge her credibility.  She admitted that she signed every check and
spent at least $37,000 of Johnny=s money,
but she testified that she did not intend to steal from Johnny, and that she
did not steal from him.  She also
testified that Johnny was the one who approached her about going into business
and wanted a 50/50 partnership; that she always had Johnny=s
consent to write the checks (alternatively also claiming that some of the money
was a loan to her and that Johnny told her that with a 50/50 partnership, she
was to have half of the money); and that she had no idea that Johnny was not
capable of handling his own money.  She
specifically testified that she believed Johnny was mentally competent.  The jury was entitled to disbelieve some or
all of her testimony.  See Johnson,
23 S.W.3d at 8B9.

Viewing the evidence from numerous witnesses
regarding Johnny=s  mental deficiency in the light most favorable
to the prosecution, without reevaluating the weight and credibility of the
evidence, we hold that the evidence of ineffective consent is legally
sufficient to uphold Hardee=s theft
conviction.  Likewise, viewing the
evidence in a neutral light, we cannot say that the record clearly reveals that
a different result is appropriate or is necessary to correct a manifest
injustice.  Therefore, we hold that the
evidence is also factually sufficient to uphold Hardee=s theft
conviction.  We overrule Hardee=s first
two points.

                                    IV.  Closing Arguments








In Hardee=s third
through seventh points of error, she complains about various aspects of the
State=s
closing arguments at the guilt-innocence and punishment phases of trial.  We have reordered them based on the order in
which they appear in the record.

A.  Standard of Review

To be permissible, the State=s jury
argument must fall within one of the following four general areas:  (1) summation of the evidence; (2) reasonable
deduction from the evidence; (3) answer to argument of opposing counsel; or (4)
plea for law enforcement.  Felder v.
State, 848 S.W.2d 85, 94B95 (Tex.
Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro v.
State, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).








Furthermore, if a jury argument exceeds the
bounds of proper argument, the trial court=s
erroneous overruling of a defendant=s
objection is not reversible error unless it affected the appellant=s
substantial rights.  Tex. R. App. P.
44.2(b); Martinez v. State, 17 S.W.3d 677, 692B93 (Tex.
Crim. App. 2000); Mosley, 983 S.W.2d at 259.  In determining whether the appellant=s
substantial rights were affected, we consider (1) the severity of the
misconduct (i.e., the prejudicial effect of the prosecutor=s
remarks), (2) curative measures, and (3) the certainty of, depending on the
phase of trial, either the conviction or the punishment assessed absent the
misconduct.  Martinez, 17 S.W.3d
at 692B93; Mosley,
983 S.W.2d at 259.  We apply the same
considerations to whether the trial court abused its discretion when the trial
court sustains an objection and instructs the jury to disregard but denies a
defendant=s motion for a mistrial.  Hawkins v. State, 135 S.W.3d 72, 77
(Tex. Crim. App. 2004).  Only in extreme
circumstances, when the prejudice caused by the improper argument is incurable,
i.e., Aso
prejudicial that expenditure of further time and expense would be wasteful and
futile,@ will a
mistrial be required.  Id.; see also
Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert.
denied, 542 U.S. 905 (2004).

B.  Guilt-Innocence Phase Objections

1.  Points
5 and 6: Mistrial and Enron Reference

In Hardee=s fifth
point, she complains that the trial court failed to grant her motion for
mistrial after the prosecution allegedly injected facts outside the record to
indicate that the prosecutor was an expert and that the jury should follow his
recommendations.  In her sixth point, she
complains that the Atrial court erred in overruling
[her] objection to prosecutors comparing the present case to the infamous Enron
case in an attempt to paint [Hardee] with the same prejudice attached to Enron.@








During closing arguments, defense counsel told
the jury that A[t]his case is a civil case . .
. .  This is a civil suit that=s being
prosecuted in a criminal case . . . . 
She should be sued . . . .  This
thing should be sorted out in the civil court because that=s
exactly what this is.@ 
In response to the Acivil
suit@
argument, the following exchange occurred during the State=s
closing argument: 

[PROSECUTOR]:  . . . . 
Okay.  Now, mentioned just a
coupleCoh, yeah.  This is a civil case.  He says this is a civil case.  In all cases,Cnot all.  In most cases where people get caught in
what we call white collar crime or nonviolent crimeC

 

[DEFENSE]:  Objection, Your Honor, in all cases, other
cases.  It=s clearly 401, 403, and
404.  It=s also prior extraneous.

 

THE COURT:  Sustained.

 

[DEFENSE]:  Have an instruction the jury disregard that
argument?

 

THE COURT:  Jury will disregard the last comment of
counsel.

 

[DEFENSE]:  We move for [a] mistrial.

 

THE COURT:  Denied.

 

[PROSECUTOR]:  All right. 
I=ll mention to you that,
shall we say, that=s an easy out for people who have been caught
red-handed, with their hand in the cookie jar, say, oh, well, this is a civil
case, let=s go to civil court, let=s don=t have any criminal
penalties attached to Enron.  No, it=s all civil.  That=s a very common, very
common thing.

 

[DEFENSE]:  Objection, Your Honor, same thing [i.e., 401,
403, 404, and prior extraneous].

 

THE COURT:  Sustained.

 

[DEFENSE]:  Have an instruction jury disregard that.

 

THE COURT:  Jury will disregard the last comment of
counsel.

 

[DEFENSE]:  And we move for a mistrial.








THE COURT:  Denied. [Emphasis added.]

 

When a trial court sustains an objection and
instructs the jury to disregard the State=s
argument but denies a defendant=s motion
for mistrial, the issue is whether the trial court abused its discretion in
denying the mistrial.  Hawkins,
135 S.W.3d at 77.  Its resolution depends
on whether the court=s instruction to disregard cured
any prejudicial effect.  Id.  To determine whether the trial court abused
its discretion, we balance (1) the severity of the misconduct (prejudicial
effect), (2) curative measures, and (3) the certainty of conviction absent the
misconduct.  Id.; Mosley,
983 S.W.2d at 259.








In the fifth point, the prosecutor was responding
to defense counsel=s argument that Johnny should
have sued Hardee and that civil court was more appropriate under the
circumstances.  This was a permissible
argument in that it was an answer to the argument of opposing counsel.  See Felder, 848 S.W.2d at 94B95.  Hardee received an instruction to disregard,
and an instruction to disregard is presumed to cure the harm.  Wesbrook v. State, 29 S.W.3d 103, 115
(Tex. Crim. App. 2000), cert. denied, 532 U.S. 944 (2001).  It is presumed that the jury will follow a
trial court=s instruction to disregard a
comment.  Id. at 116.  If the instruction cured any harm caused by
the improper argument, a reviewing court should find that the trial court did
not err; almost any improper argument may be cured by an instruction to
disregard.  Dinkins v. State, 894
S.W.2d 330, 357 (Tex. Crim. App.), cert. denied, 516 U.S. 832 (1995); Faulkner
v. State, 940 S.W.2d 308, 312 (Tex. App.CFort
Worth 1997, pet. ref=d).  Only if the reviewing court determines that
the instruction was ineffective does the court go on to determine whether the
error was harmful.  Tex. R. App. P. 44.2.

Given the volume of testimony to support Johnny=s
ineffective consent, previously discussed above, and Hardee=s own
admission that she spent at least $37,000 of Johnny=s money,
Hardee=s conviction
was certain even absent the misconduct, if any. 
Therefore, we hold that the instruction to disregard cured any harm, and
we overrule Hardee=s fifth point.

Furthermore, as demonstrated above, the trial
court did not overrule Hardee=s
objection to the statement about Enron; it sustained that objection. Therefore,
Hardee=s sixth
point is without merit.  Additionally,
however, the trial court granted her an instruction to the jury to disregard
the comment, and the comment was made in the same vein as the prosecutor=s
earlier comments about civil trials in response to defense counsel=s
earlier argument.  Because this passing
reference, in light of the evidence presented at trial and likelihood of
conviction, could not have led to Hardee=s
conviction, we overrule Hardee=s sixth
point.








2.  Point
4:  Unsworn Testimony and Opinion
Objections

In Hardee=s fourth
point of error, she complains of three statements made by the State during the
guilt-innocence phase closing argument:

a.  First Statements[16]

 

[PROSECUTOR]:  . . . . 
But two weeks later, when she starts spending that money for a purpose
other than going into business, she misapplied it.  It=s contrary to an
agreement.  There doesn=t have to be a written
agreement.  Most people go into business
and partnerships on a handshake.

 

[DEFENSE]: Objection,
Your Honor, as to what most people do. 
Again, he=s testifying outside the
record.

 

[PROSECUTOR]:  Common, everyday knowledge, Your Honor.

 

THE COURT:  Overruled.

 

[DEFENSE]:  Note our exception.

 

[PROSECUTOR]:  Thank you. 
Now, it didn=t take long for himCfor her to starting [sic]
spending the money for her own personal benefit.  Folks, give her the benefit of the
doubt.  Maybe she didn=t intend to steal
it.  I think she had the whole scheme.

 

[DEFENSE]:  Objection, Your Honor, as to what counsel
thinks.

 

[PROSECUTOR]:  I think the evidence will showCI=ll rephrase.  I think the evidence will showC

 

[DEFENSE]:  May I have a ruling on my objection, Your
Honor?

 








THE COURT:  It=s overruled because he didn=t say anything.

 

[PROSECUTOR]:  I think the evidenceC

 

[DEFENSE]:  Objection, Your Honor.  He saysCyou know, it=s his opinion.

 

[PROSECUTOR]:  My opinion of the evidence, Your Honor.

 

[DEFENSE]:  Opinion of the evidenceC

 

THE COURT:  Overruled as stated.

 

[PROSECUTOR]:  Now, anything I tell you is what I believe
the evidence shows.  Obviously your
judgment is 12 times better than mine, so you call it like you see it, and that=s the important
part.  ButC

 

[DEFENSE]:  May I have a continuing objection to this,
Your Honor?  I object to that last
statement again.  And could I have a
continuing objection on this line?

 

THE COURT:  Overruled. 
And your objection is toC

 

[DEFENSE]:  Any references to what his thought and his
belief in what the evidence showsC

 

THE COURT:  That=s granted and overruled.

 

[DEFENSE]:  Continuing objection is granted?

 

THE COURT:  Yes, it=s granted. [Emphasis added.]








b.  Second Statement[17]

 

[PROSECUTOR]:  She=s smart enough to handle car deals, put titles
together.  SheClet me tell you, the
woman ain=t no dummy.  She wants you to believe she is.  She=s trying to scam you the
same way she scammed Johnny.  To make you think, oh, poor
Cynthia, she doesn=t know what she=s doing.  She sold cars.  Now, when you sell cars, you got to go out on
the lot.  You=ve got to meet the
people.  You=ve got to talk to
them.  You=ve got to know what=s on the car.

 

[DEFENSE]:  Your HonorC

 

[PROSECUTOR]:  Everybody knows that.

 

[DEFENSE]:  Objection, Your Honor.  There=s no evidence she ever sold cars.  He=s testifying outside the record.

 

THE COURT:  Overruled. 
[Emphasis added.]

 

c.  Third Statement      

 

[PROSECUTOR]:  . . . . 
Ladies and gentlemen, 75,239. 
That=s the number that has
been calculated up through this account. 
I submit to you, ladies and gentlemen, even if she didn=t steal it, she darn sure
didn=t apply it consistent
with the agreement they had to go into business.  So if she wants to say she didn=t steal it or I didn=t intend to steal it when
I was at the bank, then, guess what, she formed an intent to misapply it
later, and she misapplied it contrary to the agreement. 

 








A partner is a fiduciary.  A commercial bailee is nothing more than
somebody that keeps a property for hire like a parking lot or a warehouse or
something, so that doesn=t really enter into it.  It=s just
in the law.  So we don=t really
have that issue.  But what I=m here
to tell you, ladies and gentlemen, is whether you find her guilty of one count
or you find her guilty of both counts, you can do either one, but I submit to
you Cynthia Hardee took everything Johnny Bryant had earned or saved or worked
for for 40 years.  And if we don=t
protect the weakest amongst our citizens, why do we have a system.  People say why don=t they
do something.  You are now the they.  And we appreciate your efforts.  We will appreciate your verdict, whatever it
is, but I submit to you the evidence justifies a guilty verdict on both
counts.  Thank you. [Emphasis added.]

Hardee argues that the statements in italics
above Aviolated
[her] right to the presumption of innocence and her right to a fair trial,@ are
harmful, and require reversal of her convictions.

Hardee=s
initial objection was to the statement, Amost
people got into business and partnerships on a handshake,@ and not
to the statement, Ashe misapplied it.  It=s
contrary to an agreement.@ 
That is, her original objection to the first statement was that the
prosecutor was testifying outside the record. 
Because the complaint made on appeal must comport with the complaint
made in the trial court, she has forfeited this error, if any.  Heidelberg v. State, 144 S.W.3d 535,
537 (Tex. Crim. App. 2004); Bell v. State, 938 S.W.2d 35, 54 (Tex. Crim.
App. 1996), cert. denied, 522 U.S. 827 (1997); Rezac v. State,
782 S.W.2d 869, 870 (Tex. Crim. App. 1990). 
We overrule this portion of Hardee=s fourth
point.








Hardee then objected to the second statement in
this section, AI think she had the whole
scheme,@ and her
objection to this statement was that the prosecutor was expressing an
opinion.  However, Athe
prosecutor may argue his opinions concerning issues in the case so long as the
opinions are based on the evidence in the record and not as constituting
unsworn testimony.@  Wolfe v. State, 917 S.W.2d 270, 281 (Tex.
Crim. App. 1996); see also Penry v. State, 903 S.W.2d 715, 756 (Tex.
Crim. App.), cert. denied, 516 U.S. 977 (1995); McKay v. State,
707 S.W.2d 23, 37 (Tex. Crim. App. 1985), cert. denied, 479 U.S. 871
(1986).  With regard to the Awhole
scheme@
statement, the prosecutor was beginning to express an opinion that was not
completed due to the objection; however, having reviewed the record, we
conclude that the opinion reasonably appears to be based upon evidence
contained within it.[18]  Hence no error occurred in overruling this
objection, and we overrule this portion of Hardee=s fourth
point.








The prosecutor=s next
comment to which Hardee now objects was to the effect that Hardee was scamming
the jury the same as she scammed Johnny. 
However, the record reflects that Hardee=s actual
objection during closing arguments was that the prosecutor was testifying
outside the record again, complaining that there was no evidence that Hardee
ever sold cars.  Therefore, we overrule
this portion of Hardee=s fourth point because her
complaint on appeal fails to comport with the error complained of at
trial.  Heidelberg, 144 S.W.3d at
537; Bell, 938 S.W.2d at 54; Rezac, 782 S.W.2d at 870.

The final statement to which Hardee objects was
to the effect that she had formed an intent to misapply the money and had done
so contrary to the agreement between her and Johnny.  However, the only objection that might apply
to this statement would be the running objection to opinion testimony or testimony
outside of the record that defense counsel secured earlier in the prosecutor=s
argument.  Because this statement clearly
is a reasonable deduction from the evidence as seen through the eyes of the
State and does not constitute the improper injection of a personal opinion or
testimony outside of the record, assuming that Hardee preserved this error, we
overrule the remainder of her fourth point.

C.  Punishment Phase Objections

1.  Point
7:  Restitution








In Hardee=s
seventh point, she complains that the trial court erred by overruling her
objection to a portion of the State=s
closing argument regarding Hardee=s
ability to pay back Johnny=s losses
by injecting harmful, unsworn testimony.

Although Hardee argues that the statement
regarding whether she could pay Johnny back is Apurely
speculative,@ the issue was raised during the
punishment trial.  During the punishment
phase, Hardee=s counsel asked witnesses: ADo you
think that resources of the County would be better spent helping her to get her
life back together and pay restitution[?]@ and ADo you
think she could live up to and do the conditions of probation, report, pay a
fee each month, pay restitution . . . [?]@
[Emphasis added.] During closing arguments, he told the jury that A[it]
could . . . ameliorate some of that punishment by recommending probation, doing
certain things, whatever condition the Judge wants to put on her, including
pay restitution . . . @; that
the court could set out a restitution plan; and that they should A[t]hink
about the restitution [Johnny] can get from her.@  [Emphasis added.]

During closing arguments, the State responded to
the foregoing by telling the jury:

He said, well we can have a restitution plan, and
we can maybe pay back.  How much has been
paid back in five years?  280 bucks.  You=ve heard
them say she=s on disability.  She can=t
work.  What are the chances
realistically, folks, of Johnny Bryant ever getting paid back by Cynthia
Hardee?  I say they come under the
heading of slim and none.








The jury had previously heard evidence that
Hardee was unable to work because of a disability, that Johnny=s money
had partly been used to pay her bills, that she was constantly behind on her
bills including at the time of trial, that she had returned a few items that
could be sold and had refused to return other items, and that it was Hardee=s
husband who had given Johnny=s sister
$280.  Therefore, the State=s
argument was permissible as a reasonable deduction from the evidence, i.e.,
that Hardee would be unable to repay any significant restitution, and as an
answer to the argument of opposing counsel. 
See Felder, 848 S.W.2d at 94B95.  We overrule Hardee=s
seventh point.

2.  Point
3:  Community Expectations

In Hardee=s third
point of error, she complains that the trial court erred by overruling her
objection to the italicized portion of the following exchange:

[PROSECUTOR]:  . . . . 
But my question is, where does the conduct of a person who steals
everything a mentally challenged person has and has ever accrued in a savings
plan fall on that range of punishment [between stealing $75,000 from a large
company such as General Motors, which might not notice it in its bottom line,
and a Amom-and-pop@ pizza place that could
significantly impact its ability to do business]?  I submit to you a fair consideration of those
facts would indicate that it=s obviously at the upper end.  And here again, not because it=s [Hardee].  It could be anybody else.  And we don=t want this to happen
again.  We want people to read in the
media.  We want people to hear about it
on television.  We want people to know.

 








[DEFENSE]:  Objection. 
This is not a proper plea for law enforcement and arguing that they
should consider community standards or actions or what=s in the paper, Your
Honor.

 

THE COURT:  Overruled.

 

[DEFENSE]:  That=s improper. 
May I have a continuing objection on that?

 

THE COURT: 
Granted.  [Emphasis added.]

Hardee argues that the State=s
comments Aconstituted an improper plea for
law enforcement because the jurors were asked to consider community standards
when assessing punishment@ and that the Aextremely
prejudicial nature of this type of argument@
requires our reversal of the jury verdict.








Hardee asserts and the State acknowledges that it
is improper for the State to argue Athat the
community or any particular segment of the community expects or demands either
a guilty verdict or a particular punishment.@  Borjan v. State, 787 S.W.2d 53, 56
(Tex. Crim. App. 1990).  Put another way,
Aa jury
argument referring to the expectations or demands of the community for a
particular result constitutes reversible error . . . .@  Bothwell v. State, 500 S.W.2d 128, 130
(Tex. Crim. App. 1973).  In Cortez v.
State, the court of criminal appeals gives numerous examples of improper
jury argument based on community expectations and sums up the impropriety as
follows: A[These] above arguments have
been disapproved by this Court because the effect of the language used was to
ask the jury to convict or punish the defendant upon public sentiment or desire
rather than upon the evidence that the jury had received.@[19]  683 S.W.2d 419, 421 (Tex. Crim. App.
1984).  The impropriety is not in asking
the jury to be the voice of the community but in asking the jury to lend its
ear to the community.  Id.  This impropriety is also distinguishable from
proper pleas for law enforcement, including the relationship between the jury=s
verdict and the deterrence of crime in general. 
Borjan, 787 S.W.2d at 55.








The prosecutor=s
argument in this case, basically that the State wanted the community to hear
about this verdict so that this behavior would not occur again, is not
an argument calling upon the jury for a punishment because the community
demands it.  It is closer to asking the
jury to be the voice of the community, rather than asking it to lend its ear,
or to a proper plea for law enforcement. 
Therefore, we hold that the trial court did not err by overruling Hardee=s
objection, and we overrule her third point.

                                          V.  Conclusion

Having overruled all of Hardee=s
points, we affirm the trial court=s
judgment. 

 

BOB
MCCOY

JUSTICE

PANEL: CAYCE, C.J.; MCCOY
and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: June 18, 2009











[1]See Tex. R. App. P. 47.4.





[2]Johnny originally had
approximately $151,000 in the plan.





[3]$50 of the $111,275 was
used to open a savings account and the remaining $1,225 was taken out as cash.





[4]The record reflects that
she also sold her van to Johnny=s ex-wife and used Johnny=s funds to purchase
another car for herself.





[5]Johnny withdrew his funds
from the profit-sharing account in October 2002; the money was gone by January
13, 2003.





[6]See Tex. Penal Code Ann. '' 31.03, 32.45
(Vernon Supp. 2008).  Both offenses are
third-degree felonies.  See id. '' 31.03(e)(5),
32.45(c)(5).  A third-degree felony is
punishable by a term of imprisonment of not more than ten years or less than
two years and a fine not to exceed $10,000. 
Id. ' 12.34 (Vernon 2003).





[7]That is, she has failed
to provide any argument or legal authority to support this portion of her first
two points.  See Tex. R. App. P.
38.1(i); Tong v. State, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000), cert.
denied, 532 U.S. 1053 (2001); Mosley v. State, 983 S.W.2d 249, 256
(Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999).





[8]Hardee also states as
part of her factual sufficiency point that A[i]n addition to the question of consent, the
evidence in this case is also insufficient to show that [Hardee] had the
requisite intent to deprive [Johnny] of his property.@  However, Hardee has failed to brief this
contention, so to the extent that she has raised this as part of her first
issue, we overrule it as inadequately briefed. 
See Tex. R. App. P. 38.1(i).





[9]Johnny=s sister recorded the
conversation on audiotape.  The audiotape
was not admitted into evidence.





[10]When asked whether Johnny
knew how to pay enough money to assist his ex-wives with his children, his
sister replied, AHe knew how to hand
somebody some money when they asked for it, if he had it.@





[11]She also relies on her
own testimony that she had no business experience prior to the partnership with
Johnny, apparently to account for the abysmal failure of their partnership.





[12]Webster testified,

 

I believe that Johnny did know what he was doing.  Johnny wasCyou know, every time you saw him when you go into
Brookshires, he was always working.  He
was always doing things just like everybody else.  He seemed to have the same type of lifestyle
that the rest of us did.  He worked, he
had a family, he came to church, he learned, and he always had things to talk
about, and he always had things that he wanted to do.  And so I just considered him to be no
different than anyone else.





[13]Elsewhere, the record
reflects that Hardee wrote an $11,000 check to that church out of Johnny=s funds as tithing for AJ&Cc Enterprises,@ which she testified
stood for Johnny, Cynthia (Hardee), and Candace, Hardee=s daughter.





[14]Gilley testified that
Johnny could not read the written instructions for setting up the choir=s equipment and that his
impression of Johnny was that he was slow and Awould have a problem with
any kind of a complicated transaction.@  He also
testified about Johnny=s trusting nature and
stated, AI think I could sell John
the Brooklyn Bridge.@





[15]Crumbaker testified that
she concluded that Johnny was Amentally challenged@ from her conversations
with him and that it would not take very long for anyone to come to this
conclusion.





[16]Hardee lists these as
second of her three complained-of sections under her fourth point.





[17]Hardee lists this as
first of her three complained-of sections under her fourth point.





[18]That is, testimony about
how Hardee used Johnny=s money and Hardee=s own testimony, in which
she alternatively claimed that she had Johnny=s permission to use the
money, that some of the money was a loan to her, and that Johnny told her she
was entitled to half of the money, could allow the reasonable deduction that
Hardee=s plan was to take
advantage of Johnny and to use his money for her own benefit.





[19]These examples include:

 

The people of De Soto are
asking the jury to convict this defendant. 
The people of this community expect you to put this man
away . . . .  I tell
you, the people of Matagorda and Jackson counties are expecting you to do your
duty in this case and assess the defendant=s punishment at death. . . .  Look at this courtroomCit is crowded with Polk
County people, demanding the death penalty . . . .  The people are present in this courtroom to
see that this defendant gets punished . . . . 
The will and wish of every law abiding citizen of Commanche County wants
a verdict of death . . . .  The people of
Nueces County expect you to put this man away . . . .  The jury ought to convict the defendant
because the people of Denison desire it. 

 

Cortez, 683 S.W.2d at 421
(citations omitted).